**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **Derrick Beggs,**<br><br>         **Plaintiff,**<br><br>**v.**<br><br>**Capital One Services, LLC,**<br>**Capital One Financial Corporation, and**<br>**Capital One, National Association,**<br><br><br>         **Defendants.** | **CIVIL ACTION NO.** _____ |

**COMPLAINT**

Plaintiff Derrick Beggs, ("Plaintiff" or "Beggs"), respectfully moves for judgment against Defendants Capital One Services, LLC, Capital One Financial Corporation and Capital One, National Association, (collectively "Capital One" or "Defendants"):

**Introduction**

1.  This is a claim for relief pursuant to Older Workers Benefits Protection Act (OWBPA), and subject to this Court's ruling on the OWBPA claim, should Plaintiff prevail on such claim, then Plaintiff asserts a corresponding claim under the Age Discrimination in Employment Act (ADEA). Plaintiff was employed by Capital One, and upon his termination signed a "Letter of Agreement" purporting to release his claims under ADEA. Plaintiff alleges that he was terminated pursuant to an employment termination program and that the Letter of Agreement failed to comply with the OWBPA requirement of 45-day consideration period and a listing of names and job titles of others affected by the program.  Plaintiff is entitled to keep his

1

severance payment and sue Capital One for age discrimination. *Oubre v. Entergy Operations*, 522 U.S. 422 (1998). Plaintiff may sue for an OWBPA violation. *Krane v. Capital One*, 314 F. Supp. 2d 589 (E.D.Va. 2004) (Payne, J.). In conjunction with a Court determination that the Letter of Agreement did not comply with OWBPA and, conditioned on such finding, plaintiff seeks relief for age discrimination under ADEA.

2.      Although Plaintiff intended to bring this as a collective action under 29 U.S.C. § 216(b), the Court's decision on June 8, 2020 in *Hutchens v. Capital One Services, LLC, et al.*, Case No. 19-cv-546 precludes such an action because the identical "Letter of Agreement" that Plaintiff signed was at issue in *Hutchens* for which this Court held that plaintiff could not proceed collectively. If this Court or a higher Court ultimately reverses the *Hutchens* holding and allows a collective action to proceed, then Plaintiff will join with the plaintiff in *Hutchens* and other similar cases in order to proceed collectively against Defendants, and Plaintiff reserves the right to amend this Complaint accordingly.

## Jurisdiction and Venue

3.      This Court has jurisdiction for his ADEA claims pursuant to 29 U.S.C. § 216(b) as incorporated by 29 U.S.C. § 626(b), and under 29 U.S.C. § 626(c), in that the Plaintiff may bring this action in any appropriate United States District Court.

4.      Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

5.      Defendants are subject to personal jurisdiction in the Commonwealth of Virginia.

## Parties

6.      Beggs is a resident of Virginia who was employed by Capital One most recently

as a Principal Recruiter.  Plaintiff was an "employee" as defined in the ADEA.

7.      Capital One Services, LLC is a Virginia limited liability company, which has its principal office in Virginia.

8.      Capital One Financial Corporation is a foreign corporation, which has its principal office in Virginia.

9.      Capital One, National Association is a foreign corporation, which has its principal office in Virginia.

10.      On information and belief, the Defendants are related entities in the financial products and services industry. According to filings with the Virginia State Corporation Commission, the Defendants list their principal office as being located at 1680 Capital One Drive, McLean, Virginia 22102 and share the same registered agent.  Plaintiff is currently unable to determine the precise corporate structure and relationship between Defendants.  Defendants are an "employer" as defined by the ADEA.

### Factual Allegations

11.      Beggs was hired by Capital One in 2012 as a Principal Associate Recruiter.

12.      Beggs worked both from Capital One's West Creek Office in Goochland County, Virginia, and remotely from his home.

13.      During the time frame relevant to this lawsuit, Beggs worked for Capital One as a Principal Associate and was responsible for screening, interviewing, administering offers, and developing collaborative strategies with clients that Capital One assigned to him to.

### Performance Management

14.      Capital One has five categories for its performance evaluation ratings scale: Exceptional, Very Strong, Strong, Inconsistent, Action Required.

15.    Capital One informally refers to the five categories as five "buckets."

16.    As part of the evaluation process each year, Capital One employees are issued an overall rating which places them within one of the five "buckets."  This overall rating consists of two areas: "Results" (which are generally objective metrics) and "Competencies" (which consist of subjective criteria such as "communications," and "lives the values").

17.    During the entirety of his employment with Capital One, Beggs received an overall rating of "Strong" or "Very Strong" for every evaluation.

### Policy to Increase "Involuntary Attrition"

18.    Capital One claims to hire the best and brightest associates available. For example, Chief Information Officer Rob Alexander stated in a blog post on July 19, 2017 that Capital One has a "best people philosophy," which involves hiring the "best talent in the industry."

19.    During the relevant time period, Capital One implemented a policy that sought to increase Capital One's "involuntary attrition" rate of employees, that is, terminations based on alleged poor performance or job elimination.

20.    In order to carry out Capital One's new policy to increase "involuntary attrition" it changed or implemented other personnel policies, including:

   a.    Prohibiting employees rated "Inconsistent" from finding other roles within Capital One (the "No-Transfer" policy);

   b.    Changing from a "performance management" distribution that was a "guide" or "aspirational" distribution (previously as low as 5% in the bottom two "buckets"), to a mandatory forced distribution;

   c.    Changing the prior policy which only required a "coaching plan" or PIP

for employees in the "Action Required" bucket, to now also requiring a coaching plan or PIP for all employees who are rated in the "Inconsistent" bucket.

21.     The No-Transfer policy that went into effect was that any employee rated "Inconsistent" was prohibited from transferring to another role within Capital One without special dispensation from a VP-level executive.  Individual discretion of managers to accept transfers of employees rated "Inconsistent" was prohibited. Previously employees rated "Inconsistent" were allowed and encouraged to find other roles within Capital One (based on its "best people philosophy"), and the hiring managers had wide discretion to approve, and routinely did approve, such transfers.

22.     The most significant change in Capital One policy was that it intentionally sought to increase its rate of "involuntary" terminations.

23.     Capital One tracks percentages of "involuntary" terminations, also known within Capital One as "involuntary attrition."

24.     At Capital One, "involuntary attrition" refers generally to terminations that are "involuntary" to the employee, namely (1) performance-based terminations, and (2) job eliminations (known within Capital One as "restructuring").

25.     Upon information and belief, Capital One required its managers to involuntarily terminate a set percentage of its employees across all business units.

26.     The policy requirement to meet specific "involuntary attrition" targets was set by the highest executives within Capital One.

27.     "Performance Management" was the primary means by which this central policy of increasing "involuntary attrition" rates was implemented.

28.     At Capital One the term "distribution" means the range of performance ratings set

for each "bucket" of performance. Previously the "distribution" percentages set for each "bucket" was aspirational. During the relevant time period of this lawsuit, Capital One's "distribution" percentages were mandatory.

29.     This "Performance Management" policy of forcing managers to rank a fixed percentage of employees as poor performers was informally called "forced rankings" or "forced distribution" by Capital One employees.

30.     Under the guise of "Performance Management," the Executive Committee (EC) members, (the highest echelon of executive leadership at Capital One), determined the specific forced "distribution" percentages applicable to their lines of business. Managers within those lines of business had to meet the forced distribution resulting in a fixed percentage of employees ending up in each of the performance "buckets" as pre-determined by the EC executive.

31.     From the bottom two "buckets," employees were placed on "coaching plans" or "performance improvement plans" ("PIPs").

32.     Employees who, through "Performance Management" were forced into the bottom two buckets or placed on "coaching plans" and "PIPs," were the pool from which managers then would identify the ultimate target of "involuntary" terminations.

33.     In addition to "Performance Management," Capital One engaged in some restructuring in the form of job eliminations which also counted towards its targeted increase of its "involuntary attrition" rate.

34.     Elsewhere in the private sector, where an employer requires a set percentage of employees to be ranked as poor performers, this practice is commonly called "stack rankings." (*See, e.g.* Amazon to Drop Dreaded Stack-Ranking Performance Reviews, *Seattle Times*, Nov. 14, 2016; Microsoft Gets Rid of Stack-Ranking Review System, *Seattle Times*, Nov. 12, 2013).

35.     The problem with stack rankings is that employees who are objectively meeting all performance expectations are falsely rated as poor performers.

36.     Falsely giving good employees poor performance evaluations became Capital One's standard operating procedure under its "Performance Management" policy.

37.     The Requirement that a fixed percentage of employees be rated as poor performers, with a subset therein being terminated "involuntarily," led to objectively well-performing employees being issued poor performance evaluations, coaching plans, and PIPs, and ultimately terminated.

38.     Although performance evaluations, coaching plans, PIPs, and terminations were issued directly to individual employees, it was all done as part of an overall policy implemented by Capital One to increase "involuntary attrition" rates across all lines of business.

39.     Through "involuntary attrition" of current employees, Capital One was making room for younger employees pursuant to a marketing, recruiting, and hiring campaign to attract recent college graduates.

40.     At the same time that Capital One was implementing stack rankings to increase the rate of "involuntary" terminations, it was engaging in a marking, recruiting, and hiring campaign to attract recent college graduates to Capital One.

41.     "Our No. 1 principle is to attract really talented people," [Capital One VP of Human Resources Judy] Pahren says. "We know our success is dependent on talent." Recruiting younger workers like millennials, she adds, "is key to that strategy." *See* Virginia Business Magazine, The Rise of Millennials, November 2019.[1]

---

[1] Available at https://www.virginiabusiness.com/article/the-rise-of-the-millennials/ (last accessed Dec. 4, 2020).

42.     Capital One's effort to hire younger workers came through its Campus Recruiting Program ("CRP"), which focused on hiring only recent college graduates.

43.     Within the past two years the CRP has been open only to college graduates in classes 2017 to 2021. Based on the general age of college graduates between the years of 2017 and 2021, Capital One has essentially set its hiring criteria to candidates in their early to mid-20s.

44.     Currently, Capital One's website makes clear that its "Full-Time Programs" in the CRP are limited only to college graduates from the classes of 2019 to 2021. (https://campus.capitalone.com, visited December 22, 2020).  The website directs anyone who graduated before 2019 to apply for jobs to Capital One's main site, separate from the CRP programs:



(https://campus.capitalone.com/full-time-programs/, visited December 22, 2020) (red circle added, link redirecting to https://www.capitalonecareers.com/search-jobs).

45.     In order to make room for the new CRP recruits in their early to mid-20's, Capital One intentionally increased its "involuntary attrition" rate, that is the rate at which employees are

involuntarily terminated from their employment with Capital One.

46.     In order to increase its "involuntary attrition" rate and to make room for new hires in their early to mid-20's through the CRP program, Capital One required its managers to engage in the forced distribution, stack rankings, and issuance of "coaching plans" and "PIPs," under the guise of "performance management" as set forth above.

## Termination of Beggs

47.     Although Beggs was hired by Capital One in 2012 at age 43, that was before it implemented its policy to increase "involuntary attrition" beginning in 2017.

48.     Capital One's termination of Beggs did not arise out of individual circumstances. It was a result of Capital One's mandate requiring managers to increase "involuntary attrition."

49.     Performance evaluations were typically done once a year, with results coming out in late January for the prior calendar year's performance. There was also a mid-year performance status in June or July, but it was fairly informal.

50.     However, in furtherance of Capital One's policy to use "performance management" to increase "involuntary attrition" rates, the mid-year performance process became as stringent as the year-end one, and managers were also required to meet "distribution" goals during this formerly informal "mid-year" process. So long as each department's "distribution" percentages met the goal established by Capital One executives, the front-line managers were given unchecked discretion over their rating assignments and calibrations, even if such discretion went against stated policy.

51.     From his hire in 2012 through 2018, Beggs only received overall ratings of "Strong" or "Very Strong" on his Year-End performance evaluations.

52.     Between 2015- 2017, Beggs only received ratings of "Strong" or higher in every

individual competency area assessed by his supervisors.

53.     Beggs received an overall rating of "Strong" at the end of 2017.

54.     In May 2018, Beggs was assigned to screen a candidate for potential internal promotion who had recently been issued an "Inconsistent" rating.  Beggs informed the candidate about Capital One's recent implementation of the "No-Transfer" policy, preventing his consideration for the position.  The candidate expressed concerns with the subjectivity of Capital One's performance management system.  Beggs passed this concern along to his supervisors.

55.     This event occurred prior to Beggs taking preapproved vacation.

56.     Upon his return, to Beggs's surprise, his supervisor, Susan Brault ("Brault"), put him on a "coaching plan," alleging that Beggs was no longer meeting the expectations of his position.

57.     Susan Brault was the same supervisor who had overseen Beggs's most recent performance evaluation, where she had issued him an overall rating of "Strong".

58.     Mere days after Beggs was informed that he was being put on a coaching plan, he noticed that Capital One had posted a job opening to their web portal seeking a Principal Recruiter with a job description that matched the position Beggs currently held.

59.     Brault fabricated reasons to support placing Beggs on a coaching plan, including highly subjective criteria that could not easily be disputed, but was generally devoid of objective metrics.

60.     After being placed on the coaching plan, Beggs asked to review any documents or emails containing negative feedback on his performance.  No such records were provided to him.

61.     At the time he was issued a coaching plan, the objective metrics generally showed that Beggs was in fact performing his job at a strong or very strong level.

62.     Specifically, Beggs was part of a division of recruiters that Capital One had noted was outperforming other divisions within the company at the time. Prior to being placed on a coaching plan, Beggs had only received positive feedback from his manages, had never missed any Hiring Productivity Goals, and his Quality Assurance ("QA") Metrics were the same as the vast majority of other recruiters within his division.  Capital One made false claims in Beggs' coaching plan that were contrary to the objective evidence.

63.     After being put on the coaching plan, Beggs continued to meet with his manager each week where Beggs reported on his progress and the feedback he had received from his clients.  All feedback that Beggs received from his clients during this time was positive.

64.     At each meeting, Beggs asked his manager for feedback on his performance and each time, his manager verbally told him that everything was good and that the other hiring managers had not noted any issues, obstacles, or hurdles with Beggs' performance either.

65.     Beggs expressed concern to his manager that his Coaching Plan lacked any objective metrics by which his performance would ultimately be measured, but his manager told Beggs not to worry about it.

66.     Around this same time, Beggs learned that Capital One had recently hired seven new college graduates to work within his department.  Concerned about his job security, Beggs asked his supervisors if the recent influx of younger talent meant he was going to be fired. Again, Beggs was told not to worry about it and assured that he would not lose his job.

67.     Despite these ongoing assurances from Beggs' managers and supervisors that he was meeting all expectations, at the end of June 2018, Beggs' supervisors met with him, told him that he had not met the guidelines of the coaching plan, and would be placed on a PIP accordingly.

68.     Beggs again asked to review any documents or emails containing negative feedback on his performance.  Again, no such records were provided to him.

69.     Under Capital One's use of "Performance Management" to drive up "involuntary attrition," the PIP was basically the last nail in the coffin for the targeted employee.  A termination with a PIP on the record was treated by Capital One as a "performance" based termination, providing for the least amount of severance and rendering the employee ineligible for rehire.

70.     Capital One terminated Beggs on or about August 2, 2018, listing him as a "performance" termination, and providing him the "Performance Benefit Structure" severance package.

71.     Capital One's justification for Beggs's coaching plan and PIP were false.

72.     Beggs was not a poor performer.

73.     The coaching plan and PIP were pretextual and false, and were issued in order to meet Capital One's "forced distribution" requirement in order to increase involuntary attrition.

74.     Upon information and belief, other older employees, who were also objectively strong performers, were also targeted and terminated by Capital One around the same time as Plaintiff.

75.     Capital One's process and policy of increasing involuntary attrition in the manner set forth herein (through "performance management" and job eliminations), is a facially neutral policy that has a disparate impact on employees over age 40 across all lines of business at Capital One.

76.     Such policy is an employment termination program under the OWBPA that affects two or more employees.

12

77.     Upon the termination of Beggs, Defendants provided, and Beggs signed, a Letter of Agreement ("Agreement") which provided him severance pay in exchange for waiving certain claims against Defendants. Capital One has a copy of this Agreement which is substantially similar to the Agreement in *Hutchens v. Capital One*, Case No. 3:19-cv-546 (ECF No. 1-1).

78.     Upon the termination of Plaintiff and other affected employees, Capital One failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of associates be provided.

79.     Capital One did not provide 45 days, nor the statistical data of ages and job titles of other employees as required by OWBPA.

### Count 1 – OWBPA

80.     OWBPA claims may not be released.

81.     ADEA claims may not be released unless they comply with the OWBPA.

82.     Capital One's Letter of Agreement did not comply with OWBPA.

83.     The policy alleged herein was an "employment termination program" affecting two or more employees.

84.     The Agreement provided to Plaintiff and others did not provide 45 days to consider the waiver of any rights or claims under the ADEA.

85.     The Agreement provided to Plaintiff and others did not provide the job titles and ages of all individuals selected or not selected for termination under such policy alleged herein.

86.     The Agreement was not a "knowing and voluntary" waiver of Plaintiff's rights and claims under the ADEA.

87.     Plaintiff is entitled to declaratory, equitable, and/or injunctive relief based on Capital One's OWBPA violation including but not limited to: age and job title data across the

applicable line(s) of business, data reflecting "involuntary attrition" rates, other statistical data relating to these claims; an order declaring Capital One in violation of OWBPA and permitting Plaintiff to proceed with his claim under the ADEA, without retaliation and without being in breach of the Letter of Agreement; an award of attorneys' fees and costs; and other equitable, injunctive, and/or declaratory relief requested below.

88.     The party asserting the validity of an OWBPA waiver has burden of proof that it was "knowing and voluntary." 29 USC § 626(f)(3).

89.     Capital One cannot prove that the Agreement was knowing and voluntary.

## Count 2 – ADEA

90.     Capital One discriminated against Beggs because of his age, 49.

91.     Capital One characterized Plaintiff's termination as an "involuntary" termination based on performance.

92.     Capital One provided Beggs with a severance in an amount referred to as the "Performance Benefit Structure" which, according to its Associate Severance Plan, applies where "the associate is terminated due to poor performance."

93.     The allegation of poor performance was pretextual and false.  Less than six months prior to Capital One placing Beggs on a coaching plan in May 2018, Beggs received all high ratings from his supervisor in his 2017 Year-End Review.

94.     The reasons given for placing Beggs on a Coaching Plan and PIP were pretextual and false.

95.     Throughout his Coaching Plan, Beggs was verbally told that he was meeting all expectations under the plan.

96.     The reasons noted for Beggs's termination (i.e. poor performance) were pretextual

14

and false.

97.     At the time of his termination in 2018, Beggs was one of the oldest Recruiters within his department.

98.     But for Beggs' age, he would not have been placed on a "coaching plan," nor denied accommodations, nor selected for PIP or termination.

99.     Capital One disparately treated Plaintiff and other older associates, and treated younger employees more favorably, in the forced ranking and termination of older employees.

100.     Capital One's disparate treatment of Plaintiff and older employees was willful.

101.     Capital One's policies also had a disparate impact on older employees. Specifically, Capital One's policy to increase the rate and percentage of "involuntary attrition," which was implemented through a "performance management" policy which required forced or "stack" rankings to create a pool from which "involuntary" terminations were implemented, was the standard operating procedure at Capital One.  This policy had a disparate impact on Capital One employees over age 40.  The average age of Capital One employees was reduced as older employees were replaced, in "headcount," by newer hires, many of whom were in their early to mid-20's including CRP hires.

102.     Plaintiff was disparately impacted because of his age by Capital One's policies which resulted in his termination.

103.     Capital One implemented such discriminatory policy willfully, or showed reckless disregard for the rights of Capital One's employees over 40.

104.     Given Capital One's "best people philosophy," which involves hiring the "best talent in the industry," Capital One's policy of using "forced distributions" under the guise of "performance management" in order to increase "involuntary" terminations was implemented

willfully with the intent to eliminate employees over 40 years of age while increasing hiring of younger employees. Alternatively, it was a neutral policy that disparately impacted employees over 40.

## Relief Requested for OWBPA

Wherefore, Plaintiff requests the Court grant the following Relief:

      A.      Issuance of an Order finding that Capital One did not comply with the OWBPA;

      B.      Declaring that Capital One's policy, as alleged herein, was an "employment termination program" under OWBPA;

      C.      Declaring that the "Letter of Agreement" does not comply with the OWBPA, that the waiver contained therein was not "knowing and voluntary," and that Plaintiff may proceed with his ADEA claim;

      D.      An Order directing Capital One to comply with OWBPA, including producing the ages and job titles of employees who were selected and /or non-selected for termination under the policy alleged herein, which should have produced under OWBPA;

      E.      An Order directing that notice be delivered to all Capital One employees involuntarily terminated under the policy alleged herein, who received a Letter of Agreement, informing them that their waivers are invalid and that those employees may have ADEA claims;

      F.      attorneys' fees; and

      G.      any and all further relief permissible by law.

## ADEA Relief Requested

Wherefore, Plaintiff requests the following Relief against Defendants:

A.    Court order requiring Capital One to provide statistical data relating to employees and ages, involuntary attrition rates, headcount, performance management calibrations, forced rankings, involuntary terminations, new hires, and any other employment data relevant to Plaintiff's disparate impact claim;

B.    money damages suffered by Plaintiff as a result of Capital One's age discrimination of Plaintiff, including but not limited to lost pay, benefits, and the difference in severance benefits between Capital One's "Performance Benefit Structure" which Plaintiff received, and the greater sum of the "Restructuring Benefit Structure" which Plaintiff should have received as a result of the policy alleged herein;

C.    liquidated damages in an amount equal to all money damages suffered by Plaintiff as a result of Capital One's willful violations of the ADEA;

D.    pre-judgment and post-judgment interest;

E.    reasonable attorney's fees and costs expended in the prosecution of this case;

F.    any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY** for all factual questions at issue in this case.

Respectfully submitted,
**Derrick Beggs**
Plaintiff

By:_____/s/_____
        Craig Juraj Curwood (VSB No. 43975)
        Curwood Law Firm, PLC
        530 E. Main Street, Suite 710
        Richmond, VA 23219
        Telephone: (804) 788-0808
        Fax: (804) 767-6777

ccurwood@curwoodlaw.com

and

Harris D. Butler, III (VSB No. 26483)
Paul M. Falabella (VSB No. 81199)
BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
harris.butler@butlerroyals.com
paul.falabella@butlerroyals.com
*Attorneys for Plaintiff*